COPY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**07 CV 10661**

|  |  |
|---|---|
| CHRISTINE DONLON, on Behalf of All Others Similarly Situated, | Civil Action No.: |
| **Plaintiff,** | |
| -against- | |
| MERRILL LYNCH & CO., INC., E. STANLEY O'NEAL, CAROL T. CHRIST, ARMANDO M. CODINA, VIRGIS W. COLBERT, JILL K. CONWAY, ALBERTO CRIBIORE, LOUIS DIMARIA , JOHN D. FINNEGAN, JUDITH MAYHEW JONAS, AULANA L. PETERS, JOSEPH W. PRUEHER, ANN N. REESE, CHARLES O. ROSSOTTI, JOHN DOES 1-20 (BEING CURRENT AND FORMER MEMBERS OF THE BENEFITS ADMINISTRATION COMMITTEE OF THE MERRILL LYNCH & CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN) and JOHN DOES 21-40 (BEING CURRENT AND FORMER MEMBERS OF THE INVESTMENT COMMITTEE OF THE MERRILL LYNCH & CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN), | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |
| **Defendants.** | |

Plaintiff Christine Donlon ("Plaintiff"), on behalf of the Merrill Lynch & Co., Inc. 401(k) Saving and Investment Plan (the "SIP"), the Retirement Accumulation Plan (the "RAP") and the Employee Stock Ownership Plan (the "ESOP") (the three plans treated under a single umbrella by Merrill Lynch and referred to collectively herein as the "Plan") and on behalf of a class of similarly situated participants and beneficiaries of the Plan (the "Participants"), by her attorneys, alleges the following for her Complaint ("Complaint"):

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against Plan fiduciaries, including Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company").

2.      Retirement plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in an employee pension benefit plan may have the option of purchasing/acquiring the common stock of his/her employer, often the sponsor of the plan, for part of his/her retirement investment portfolio. Merrill Lynch common stock is the principle investment alternative of the Plan.

3.      Plaintiff was an employee of Merrill Lynch and is a participant in the Plan. Plaintiff's retirement investment portfolio includes Merrill Lynch stock.

4.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Merrill Lynch stock.

5.      During the Class Period (as defined below), Defendants knew or should have known that Merrill Lynch stock was an imprudent investment alternative for the Plan. Defendants had intimate knowledge of, and an active role in, the unlawful accounting artifices and other improper activities that allowed Merrill Lynch to artificially inflate and manipulate the Company's earnings.

6.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

7.      Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the plan, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

## JURISDICTION AND VENUE

8.      Subject Matter Jurisdiction. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      Personal Jurisdiction. ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

10.      Venue. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## PARTIES

**A.      Plaintiff**

11.      Plaintiff was an employee of Merrill Lynch at all relevant times. During the Class Period, Plaintiff was, and continues to be, a participant or beneficiary of the Plan, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a), and Merrill Lynch stock was purchased or maintained on her behalf by means of the Plan in the Merrill Lynch Stock Fund.

**B.    Defendants**

**Merrill Lynch Defendants**

12.    Defendant Merrill Lynch is a Delaware corporation, with its principal executive offices located at 4 World Financial Center, New York, NY 10080.  Merrill Lynch is a global provider of broker-dealer, investment banking, financing, wealth management, advisory, asset management, insurance, lending and other related products and services. During the Class Period, Merrill Lynch common stock traded on the New York Stock Exchange.

13.    Merrill Lynch is the Plan Sponsor.  *See* Form 5500 filed with the Internal Revenue Service ("IRS") and Department of Labor ("DOL") for year ending December 31, 2005 ("Form 5500").

14.    Merrill Lynch, upon information and belief, exercises discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.  Merrill Lynch, at all times, acted through its officers, directors and employees, including members of the Board of Directors' Compensation Committee, who were appointed by the Company to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

15.    Merrill Lynch had, upon information and belief, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities. Through its Board of Directors (the "Board"), or otherwise, Merrill Lynch had the authority and discretion to hire and terminate said officers and employees.  Merrill Lynch also had the authority and discretion to appoint, monitor and remove officers and employees from their individual fiduciary roles with respect to the Plan.

16.    Additionally, by failing to properly discharge their fiduciary duties under ERISA, the Officer, Director, and employee fiduciaries breached duties they owed to Plan participants and

their beneficiaries. Accordingly, the actions of the Plan's Officers, Directors, and other employee fiduciaries are imputed to Merrill Lynch under the doctrine of *respondeat superior*, and Merrill Lynch is liable for these actions.

17.     Defendant E. Stanley O'Neal ("O'Neal") was, at all relevant times, Chairman of the Board, Chief Executive Officer and a Director of Merrill Lynch. O'Neal signed Merrill Lynch's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with Plan participants. O'Neal was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.

### *Director Defendants*

18.     Defendants O'Neal, Carol T. Christ ("Christ"), Armando M. Codina ("Codina"), Virgis W. Colbert ("Colbert"), Alberto Cribiore ("Cribiore"), John D. Finnegan ("Finnegan"), Judith Mayhew Jonas ("Jonas"), Aulana L. Peters ("Peters"), Joseph W. Prueher ("Prueher"), Ann N. Reese ("Reese") and Charles O. Rossotti ("Rossotti") served as members of the Board at all relevant times (the "Director Defendants").

19.     The Board, upon information and belief, has primary fiduciary oversight of the Plan. The Board, according to the Company's Annual Report for the year ending December 29, 2006, filed with the Securities and Exchange Commission (the "SEC") on February 26, 2007 (the "2006 10-K")determines the contribution percentage annually that the Company will make to the Plan, in the form of either cash or Company stock.

20.     Because of the Director Defendants' position, they knew the adverse non-public information about the business of Merrill Lynch, as well as its finances, markets and present and

future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

21.    During the Class Period, the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

22.    Upon information and belief, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets; and/or (iii) appointing, monitoring, and removing the Plan's fiduciaries.

### *Management Development and Compensation Committee Defendants*

23.    Defendant Cribiore, in addition to being a member of the Board, served as the Chairman of the Management Development and Compensation Committee of the Board (the "Compensation Committee"), at all relevant times. As such, Defendant Cribiore was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24.    Defendant Jill K. Conway ("Conway") has served as a Director of Merrill Lynch since 1978, until her retirement from the Board in 2007. In addition to being a member of the Board, Defendant Conway served as a member of the Compensation Committee for at least a portion of the Class Period. As such, Defendant Conway was a fiduciary of the Plan within the

meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25.    Defendants Codina, Conway, Finnegan and Peters, in addition to being members of the Board, served as members of the Compensation Committee, and as such were fiduciaries of the Plan within the meaning of ERISA, in that they exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26.    In addition to the Board collectively, the Compensation Committee, upon information and belief, is also a fiduciary of the Plan.    According to the Compensation Committee's charter, it is charged with, *inter alia*, "administer[ing] stock and stock-based compensation plans…[and] review[ing] and approv[ing]changes to benefit plans that result in the issuance of stock or material changes to the benefits provided to employees."    2007 Proxy Statement filed with the SEC on March 16, 2007 (the "2007 Proxy").    The Compensation Committee and its members therein are fiduciaries of the Plan within the meaning of ERISA in that they exercise discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.    Further, each member of the Compensation Committee, by virtue of their committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plan and its participants in that regard.

### *Administrative Committee Defendants*

27.    Defendant Louis DiMaria ("DiMaria"), at all relevant times, served as the Chairman of the Administrative Committee of Merrill Lynch.

28.    Defendants DiMaria and John Does 1-20 (the "Administrative Committee Defendants"), at all relevant times, served as members of the Administrative Committee.

29.    At all relevant times, the Administrative Committee Defendants were, upon information and belief, all employees, officers, or directors of Merrill Lynch.

30.    The Administrative Committee Defendants exercised discretionary authority and discretionary control with respect to the Plan's management, administration, investments, and assets. According to the Form 11-K for the year ended December 31, 2006, filed for the Plan with the SEC on June 26, 2007 ("2006 Form 11-K"), the Plan is administered by the Administrative Committee.

### *Investment Committee Defendants*

31.    Defendants John Does 21-40, at all relevant times, served as members of the Investment Committee of Merrill Lynch.

32.    At all relevant times, the Investment Committee Defendants were, upon information and belief, all senior executives of Merrill Lynch. *See e.g.*, 2006 Form 11-K.

33.    The Investment Committee Defendants were charged with "designat[ing] investment funds for the investment of accounts and...establish[ing] rules and procedures with respect to investment funds." 2006 Form 11-K.

## IV.    THE PLAN

### A.    Nature of the Plan

34.    The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

35.    The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law

interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action Plaintiff seeks relief that is plan-wide.

36.    The Plan is available to qualified employees at the commencement of employment.

37.    According to the 2006 Form 11-K, under the terms of the Plan, prior to January 1, 2007, Merrill Lynch could match one-half of the first 6% of eligible compensation contributed to the Plan, up to an annual maximum Company contribution of $2,000, after one year of service. As of January 1, 2007, Merrill Lynch may contribute up to 4% of each participant's eligible salary contributed to the Plan, up to a maximum of $3,000 annually for employees with eligible salary of less than $300,000, after one year of service. For employees with eligible salary equal to or greater than $300,000, the maximum annual Company contribution remains $2,000. The Board determines the exact amount to be contributed in any given year. The Company's contribution is either in the form of either Merrill Lynch common stock or cash to purchase shares of Merrill Lynch common stock.

38.    Employees become 100 percent vested in their ESOP accounts after attaining the age of 65 or completing five years of service. According to the 2006 10-K, "[u]nder the ESOP, all retirement savings are invested in [Merrill Lynch] common stock, until employees have five years of service after which they have the ability to diversify."

39.    Merrill Lynch Trust Company is the trustee of the Plan and holds the Plan's shares of Merrill Lynch stock in a trust established under the Plan. *See e.g.*, Form 5500

**B.    Defendants' Fiduciary Status**

40.    *Named Fiduciaries*. ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person

named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

41.    *De Facto Fiduciaries*.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.    Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

42.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

43.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

44.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or

exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

45.    ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor. Moreover, all Plan fiduciaries were obliged, when wearing their fiduciary hat(s) to act independently of Merrill Lynch which had no authority to direct the conduct of any of them with respect to the Plan, its investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the participants.

### C.    Defendants' Fiduciary Roles

46.    As previously stated, Merrill Lynch is the Plan's Sponsor and Merrill Lynch Company Trust Company is the Plan's trustee.

47.    Upon information and belief, the Plan document describes Merrill Lynch, the Board, the Compensation Committee, the Administrative Committee and the Investment Committee as named fiduciaries of the Plan.

48.    Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, Merrill Lynch chose to internalize at least some of these fiduciary functions.

49.    Upon information and belief, the Plan and its assets are administered and managed by the Compensation, Administrative and Investment Committees (the "Plan Committees"), selected and monitored by the Board. The Plan Committees exercised broad responsibility for management and administration of the Plan and, among its other duties, were

responsible for oversight of Plan investment options, policies, and the performance of the Plan investments, as well as the review of investment managers.

50.     In their capacity to select and monitor investment options for the Plan, the Plan Committees had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in the Merrill Lynch stock.   Upon information and belief, the Plan Committees regularly exercised its authority to suspend, eliminate, reduce, or restructure Plan investments. The Plan Committees also reported to the Board of Directors regarding these duties and responsibilities and Plan events pertaining to the same.

51.     Upon information and belief, the Plan Committees exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.   In this regard, on behalf of Merrill Lynch and the Director Defendants, the Plan Committees disseminated Plan documents and materials.

52.     The Director Defendants are Plan fiduciaries to the extent they exercised their authority to select, monitor, retain, and remove the members of the Plan Committees and, accordingly, exercised authority and oversight over the Plan Committees, which reported to the Board regarding the Plan Committees' fiduciary duties and responsibilities to the Plan and with respect to its actions pertaining to the same.

53.     Merrill Lynch is a Plan fiduciary to the extent it by and through its directors, officers, and employees, the actions of these individuals, including the Plan Committees, the Director Defendants, and others are properly imputed and attributed to Merrill Lynch, which, as the Plan sponsor, was also a fiduciary.   Therefore, the participation in and knowledge of Merrill Lynch's inappropriate and potentially unlawful practices by Defendants as alleged herein is imputed and attributed to Merrill Lynch, the Plan Committees, and the Director Defendants.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

55.     All persons who were participants in or beneficiaries of the Plan at any time during the Class Period, *i.e.*, between January 1, 2007 and the present, and whose accounts included investments in Merrill Lynch stock.

56.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.[1]

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

---

[1] According to the Company's 2005 Form 5500, there were 39,919 Plan Participants at the end of the plan year.

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

61.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### *Defendants Knew or Should Have Known That the Merrill Lynch Stock Was Not a Prudent Plan Investment as a Result of the Company's Highly Risky and Inappropriate Business Activities*

62.    Merrill Lynch, formed in 1914, provides a broad array of financial services, including the capital markets services, investment banking and advisory services, wealth management, investment management, insurance, banking and related products and services worldwide.  According to the Company's 10-Q Report for the quarterly period ended June 29, 2007 ("the 3Q'2007 Form"), Merrill Lynch "[a]s an investment bank, [is] a global trader and underwriter of securities and derivatives across a broad range of asset classes, and serv[es] as a strategic advisor to corporations, governments, institutions and individuals worldwide."  As recently as October 22, 2007, Merrill Lynch was named by *Barron's*, an influential financial weekly magazine, as the top wealth manager in the United States.

63.    Up until November of 2005, Merrill Lynch enjoyed a solid reputation of being a conservative brokerage institution.  Then, under the leadership of Defendant O'Neal, the Company decided to change its business course and get involved in complex structured securities markets.  As The New York Times (the "New York Times") recounted in the October 25, 2007 article entitled "Merrill's Chief is Being Held to Account" (the "October 25, 2007 Article"),

> *In November 2005*, Merrill Lynch's chief executive, *E. Stanley O'Neal, told investors that the brokerage firm would shift its strategy and would become more aggressive investing its own money.*
>
> *The strategy*, Mr. O'Neal said at the time, <u>*would "not in any material way add to the risk profile of our firm."*</u>
>
> Two years later, *the bill for the strategy has come due.  Risk, it turns out, can carry a hefty price.* (Emphasis added.)

64.    In accordance with its more aggressive investment strategy, as *BusinessWeek*

reported in an October 29, 2007 article entitled "Why Merrill Got Burned So Badly,"

> ***Merrill Lynch took a leadership role in underwriting CDOs in
> 2006 and 2007, when subprime mortgage lenders all but threw
> lending standards out the window.*** Over that period, ***Merrill was
> the lead underwriter on 136 CDO deals with a dollar value of $93
> billion,*** according to Thomson Financial. ***Merrill executives may
> not have realized then just how reckless things had gotten in the
> subprime mortgage world. They do now. "We made a mistake,"
> O'Neal said*** in a conference call with analysts. ***"Some errors of
> judgment were made in the business itself and within the risk
> management function."***
>
> Merrill sure prospered while the revelry lasted, raking in $800
> million in CDO underwriting fees (more than any other firm) since
> the beginning of 2006, according to Thompson Financial/Freeman.
> …
>
> ***Now that the boom has gone bust, Merrill is left holding billions
> of dollars in less attractive pieces of CDOs that haven't been sold
> to investors.*** These pieces – often referred to as super senior
> tranches –carry higher credit ratings because they are considered to
> be the last in line to default. But these securities are rarely traded,
> low-yielding, and difficult to value. ***Merrill was sitting on a lot of
> CDO tranches by virtue of its prime underwriting rile, up to $32
> billion in exposure as of June 29, the company says. Now,
> Merrill has written down the value of those hard-to-trade
> securities by $5.8 billion and says it has cut its overall holdings
> by half.*** (Emphasis added.)

65.    During the Class Period until October 24, 2007, to maintain the Company's image

as a steady earnings performer and as having strong financial growth, Merrill Lynch persistently

under-reported the degree of risk posed to its operations by the Company's heavy exposure to the

sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as

other structured credit products and components of the leveraged finance origination market.

66.    Despite the worsening global credit conditions in the summer of 2007, Merrill

Lynch assured investors of the quality of its control mechanisms, stating in the 3Q'2007 Form

that "[w]e continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks." (Emphasis added.)

67.    The Company began to acknowledge the severity of the impact of credit market-meltdown on the business and operations of Merrill Lynch on October 5, 2007, when it noted in its press release that:

> Despite solid underlying performance in most of our businesses in the third quarter, *the impact of this difficult market was much more severe in certain of our FICC* [Fixed Income, Currencies & Commodities] *businesses than we expected earlier in the quarter*… While market conditions were extremely difficult and the degree of sustained dislocation unprecedented, *we are disappointed in our performance in structured finance and mortgages. We can do a better job in managing this risk*, as we have done with other asset classes, including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities. (Emphasis added.)

68.    Yet, even the October 5, 2007 press release was misleading in that Merrill Lynch significantly underestimated the write-down of fiscal third quarter 2007, due to the Company's losses stemming from its heavy exposure to the collapsing sub-prime mortgage market and tightening credit conditions which led to losses in leveraged financing operations.   According to that press release, the Company's write-down "related to incremental third quarter market impact on the value of CDOs and sub-prime mortgages" would be just **$4.5 billion**.

69.    A mere two and a half weeks later, that number would turn out to be a shocking **$7.9 billion**, virtually twice the number projected by the Company on October 5, 2007.  The press release issued by Merrill Lynch on October 24, 2007 finally revealed the true depth of the crisis the Company was facing in acknowledging that:

> *Third quarter 2007 results reflect significant net write-downs and losses* attributable to Merrill Lynch's Fixed Income, Currencies &

Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. sub-prime mortgages, *which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release.*

\*\*\*

"*Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter.* In light of difficult credit markets and additional analysis by management during our quarter-end closing process, *we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated,*" said Stan O'Neal, chairman and executive officer. (Emphasis added.)

70.     The stunning discrepancy between the amount of the write-down originally forecasted by Merrill Lynch, and the actual loss announced less than three weeks later, indicates that contrary to engaging in "*disciplined risk management efforts,*" as the Company boasted in its 3Q'2007 Form, the quality of the Company's internal controls was actually severely deficient.

71.     As *The Wall Street Journal* (the "Wall Street Journal") reported on the day of Merrill Lynch's fiscal third quarter disastrous earnings release, in its expose of the Merrill Lynch write-down scandal, entitled "Merrill Lynch Posts Wide Loss, Discloses Bigger write-Downs" (the "October 24, 2007 Article"):

*Merrill Lynch & Co. swung to an unexpectedly deep loss in the third quarter on the back of a $7.9 billion writedown* in its fixed-income trading business, *a hit that exceeded the Wall Street giant's net earnings for all of 2006.*

\*\*\*

*The loss,* Merrill's first since 2001, *raises questions about the company's risk management procedures* and the board's confidence in Chairman and Chief Executive Stanley O'Neal, who along with his lieutenants has ratcheted up risk-taking in Merrill's fixed-income franchise in the past two years.

<u>*Mr. O'Neal*</u>, who was paid $51 million last year, <u>*said*</u> in a conference call <u>he and his team bear responsibility for the bank's aggressive exposures to weak mortgage and structured</u>

- 18 -

**securities markets and for lax risk control.** He vowed to downsize the company's structured businesses, redeploy capital to higher-return areas such as private equity and sell "non-core" assets such as an insurance business divestiture already announced. Merrill also has suspended its stock buybacks for the rest of the year.

*Merrill's shares plunged 6.3%, or $4.15, to $62.97 in midmorning trading.*

*Calling the net loss "startling" and the scale of the writedowns "staggering," ratings agency Standard & Poor's cut Merrill's credit rating one notch to A+, its fifth highest, and kept it on negative credit outlook.*

*"The absolute size of the loss related to CDOs and subprime mortgages, and management's miscues regarding the valuation of its positions, further heighten our concerns regarding the company's risk management practices and business strategy,"* wrote Scott Pinzen, a credit analyst at the rating agency. (Emphasis added.)

72.    The revelation of the Company's poor corporate oversight mechanisms also made headlines in other publications, such as the *New York Times*, which reported in the October 25, 2007 Article that:

*Asked how Merrill got into a position to lose so much money, Mr. O'Neal said: "We made a mistake. There were errors of judgment made in themselves and errors of judgment made within the risk management function, and that is the primary reason those exposures exist."*

*The biggest mistakes included Merrill's large involvement in collateralized debt obligations and subprime lending and the company's inability to sell when the markets slowed.*

*Standard & Poor's and Moody's downgraded Merrill's debt and put it on negative watch. While S&P used to rate it at the same level as Goldman Sachs and Morgan Stanley, it will now have the same rating as Lehman Brothers and Bear Stearns, two substantially smaller competitors.* (Emphasis added.)

73.    Still other financial publications, such as the *Associated Press'* October 24, 2007 article entitled "Merrill 3Q Roiled by Mortgage Crisis," commented in the same vein that:

> *The shortfall calls into question how one of the biggest names in finance could be so off the mark, just three weeks after telling Wall Street its losses would be significantly less.*
>
> &ast;&ast;&ast;
>
> *O'Neal said the company continues to face uncertainty as global investors shy away from risky investments*, especially in the once booming fixed-income markets where mortgages are packaged together and sold as securities.  The value of these investments has been difficult to determine – one reason Merrill Lynch said its third-quarter results were sharply worse than it initially expected.
>
> &ast;&ast;&ast;
>
> *For a number of analysts, the loss shined a harsh light on the company's risk management process.*
>
> *"Results reflected what we see as poor risk management in U.S. fixed income and higher charges than announced only 2 ½ weeks ago*," said Deutsche Bank analyst Michael Mayo in a research note.  *"The lingering question in our minds is whether all of the write-downs have been taken."*
>
> &ast;&ast;&ast;
>
> *Merrill, like many of its rivals, was battered as concerns about mortgage securities triggered a global aversion to risk.  Weak credit markets also forced it to write down the value of leveraged buyout loans – about $463 million – as investors refused to finance them.* …
>
> *But the biggest trouble spot for Merrill was its fixed-income business, which is typically one of the company's top earning drivers.  Revenue in the unit was actually negative, some $5.6 billion in total, because of its CDO and subprime mortgage exposure.*  (Emphasis added.)

74.    The internal control deficiencies at Merrill Lynch revealed by the inaccuracy of its write-down projections were in fact so severe that some financial commentaries raised the possibility that the inaccurate write-down projection reported by the Company on October 5, 2007

was in fact intentional on the part of Company's management. For instance, the *InvestorGuide* financial newsletter, in an October 24, 2007 article entitled "Stock of the Day: Merrill Lynch," commented that:

> *...The Street is having a tough time figuring out whether to be more upset about the fact that the risk control procedures at a firm as well established and as experienced as Merrill (it's been around for 93 years) were this lax or that Merrill just 2 weeks ago said that writedown was going to be only $4.5 billion.*
>
> *The numbers that Merrill reported today are almost staggering.* Yes, the subprime mortgage mess has been well documented and the resulting loss in liquidity has hurt most financial institutions especially investment banks because the pace of deal making has slowed to a crawl. ...But *no Wall Street bank was forced into the red because of it and one, Goldman Sachs, actually thrived in the environment.* ...
>
> *...somebody forgot to tell Merrill that when you preannounce something, the actual number should come in close to the announcement not double the announced number. This makes it seem like Merrill doesn't know what it's doing. Let's assume math was not the problem here.* Hence, *the only other explanations for why a $4.5 billion writedown would turn into $8 billion in 2 weeks is either a) the market conditions deteriorated significantly in that period or b) <u>Merrill intentionally low-balled the writedown # perhaps in hopes that market conditions would rebound. The latter is probably the more likely explanation which is why Wall Street is even more irritated with Merrill.</u>*
> (Emphasis added.)

75.    The October 24, 2007 Article reported that O'Neal's misconduct not only brought about a serious hit to the Company's good will and reputation, but could result in severe financial, legal and regulatory ramifications for Merrill Lynch for a long time to come:

> *A rating cut often raises a firm's cost of capital.*   ...the bank warned in its earnings release that "*market conditions that affect the company's liquidity may become more severe.*"
>
> *The hit to Merrill's credibility may hurt as much as the blow to its income statement*, said David Trone of Fox-Pitt Kelton Cochran Caronia Waller.

> "*How could the company preannounce and then have such a dramatically different number*," he wrote in a note to clients that *questioned the firm's …risk management program that allows such big losses and said the firm's failure…may create legal and regulatory issues.* (Emphasis added.)

76.     Upon the Company's release of its fiscal third quarter 2007 earnings, Defendant O'Neal came under severe criticism for taking the Company from being a conservative brokerage house to one of the leading players in the highly risky sub-prime mortgage and structured securities markets. In the face of mounting criticism, on October 30, 2007, the Company announced Defendant O'Neal's resignation from Merrill Lynch.

77.     On the same day, the *Associated Press*, in an article entitled "Merrill Lynch CEO O'Neal Out," reported that O'Neal's replacement would face substantial challenges in cleaning up the Company's financial mess caused by its unorthodox investment strategies:

> The announcement Tuesday that O'Neal is retiring immediately came after *the world's largest brokerage posted a $2.24 billion quarterly loss, its biggest since being founded 93 years ago*. While a Merrill Lynch & Co. spokeswoman said *O'Neal* will receive no severance package, he *could walk away with retirement benefits and stock awards worth more than $160 million*.
>
> ***
>
> *…whoever replaces O'Neal will have to clean up the segment that is not in good order – Merrill's investments in subprime mortgages and other risky types of debt.*
>
> *Merrill Lynch* warned in early October it would report a loss after taking a writedown of some $4.5 billion, blaming the declining value of bonds and other instruments backed by mortgages made to people with spotty credit. But it *stunned Wall Street when*, less than three weeks later, *it acknowledged the writedown was actually $7.9 billion. O'Neal accepted blame for the discrepancy, which immediately led to calls for his ouster*.
>
> *O'Neal*, 56, who rose to power five years ago, *was known for shaking up top management and putting a greater emphasis on riskier bets, rather than the safety of just selling stocks.*

- 22 -

> *That strategy* – which handed Merrill Lynch record results during the market's peak – *came with a heavy cost during the tumultuous third quarter.*
>
> ***
>
> *Analysts have said this week that whoever replaces O'Neal may have to write down another $4 billion worth of bad investments in the fourth quarter.* (Emphasis added.)

78.    On the same day, the *Wall Street Journal*, in an article entitled "Wall Street Reckoning" ("October 30, 2007 Article") likewise reported that:

> *…the news [of O'Neal's departure] is causing a raft of reporting over the cultural changes and risk-taking that Mr. O'Neal brought to "Mother Merrill."* We think most of that is a sideshow. What really matters is that *Wall Street is beginning to hold its leadership accountable for the subprime debacle*.
>
> *…Mr. O'Neal…led the firm into the maze of subprime "collateralized debt obligations" this decade.* It was fun while it lasted and the vacation homes are great. Bud *amid the messy aftermath, Mr. O'Neal first cleaned out the Merrill executives who made the mistakes, and now he is taking the fall himself*. That's capitalism. (Emphasis added.)

79.    Furthermore, in the wake of Merrill Lynch's fiscal third quarter earnings release, questions emerged, not just over Defendant O'Neal's misguided leadership of Merrill Lynch, but also over the Board's lack of proper oversight of the Company operations in the course of the 2006 - 2007 period. For instance, in the October 30, 2007 Article, the *Wall Street Journal* reported that:

> One of Mr. O'Neal's purported sins was to *surprise Merrill's board* last month when the size of the company's third-quarter write-down ballooned to $7.9 billion from $4.5 billion. *That's a big surprise all right, and it suggests that oversight was late in coming.… As for Merrill's board, while it may be wielding the ax against Mr. O'Neal, shareholders have a right to ask why those directors were sleeping through 2006.* (Emphasis added.)

80.     Simultaneously with announcing Defendant O'Neal's ouster from the Company, Merrill Lynch reported in its Form 8-K filing with the SEC on October 30, 2007, that it was belatedly changing the deficient structure of its internal controls, under which the same person could be **both** the Chairman of the Board and the Company's Executive Officer:

> Effective October 30, 2007, the Board of Directors of Merrill Lynch adopted Restated By-Laws containing amendments to…Merrill Lynch's By-Laws. The amendments principally provide for the election of a chairman of the board who does not also serve as chief executive officer. (Emphasis added.)

81.     During the Class Period, as described herein, Defendants knew or should have known that Merrill Lynch stock was an imprudent investment for the Plan due to the fact that Merrill Lynch: (i) lacked appropriate internal controls to ensure the accuracy of its financial reporting and the estimates of its future financial performance to such an extent that it could not meet its disclosure obligations under the securities laws and (ii) was significantly misstating the amount of write-downs due to the losses caused by the Company's heavy exposure to sub-prime mortgages and leveraged financing operations. As a result of these undisclosed facts, Merrill Lynch's stock price was artificially inflated making it an imprudent investment for the Plan.

82.     Upon information and belief, Merrill Lynch regularly communicated with employees, including Plan participants, about the Company's performance, future financial and business prospects and Merrill Lynch stock. During the Class Period, upon information and belief, the Company fostered a positive attitude toward Merrill Lynch stock as a Plan investment, and/or allowed Plan participants to follow their natural bias toward remaining invested in the stock of their employer, even after divestiture was possible, by not disclosing negative material information concerning investment in Merrill Lynch stock. As such, Plan participants could not

appreciate the true risks presented by investments in Merrill Lynch stock and therefore could not make informed decisions regarding their investments in the Plan.

## CAUSES OF ACTION

### COUNT I

#### *Failure to Prudently and Loyally*
#### *Manage the Plan and Plan Assets*

#### *(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)*

83.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

84.    At all relevant times, as alleged above, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

85.    As alleged above, Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's ONLY investment option, Merrill Lynch stock.

86.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investment in Merrill Lynch stock under the Plan was prudent, and are liable for losses incurred as a result of such investments being imprudent.

87.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, fiduciaries may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

88.    Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

89.    According to the DOL regulations and case law interpreting ERISA § 404, a fiduciary's investment or investment course of action is prudent if:  a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and b) he has acted accordingly.

90.    Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment

duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

91.    Given the conduct of the Company as described above, Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Merrill Lynch stock because, among other reasons:

- Defendants knew of and/or failed to investigate the undue exposure of the Company's operations to sub-prime mortgages and leveraged financing that made Merrill Lynch stock an extremely risky, artificially inflated, and imprudent investment for the Plan;

- The risk associated with the investment in Merrill Lynch's stock during the Class Period was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan participants, and Defendants were aware or should have been aware that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the participants were not aware of it, Defendants had a duty to avoid permitting the Plan or any participant from investing Plan assets in Merrill Lynch stock; and

- Further, knowing that the Plan was not diversified, but was instead invested exclusively in Merrill Lynch stock, Defendants had a heightened responsibility to divest the Plan of Merrill Lynch stock if it became or remained imprudent.

92.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that Merrill Lynch stock was not a suitable and appropriate investment for the Plan as described herein. Nonetheless, during the Class Period, Defendants continued to offer Merrill Lynch stock as the ONLY investment option for the Plan and to direct and approve the ongoing, automatic investment of the future Company contributions in Merrill Lynch stock, instead of other, more suitable, investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Merrill Lynch stock

93.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

94.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### *Failure to Provide Complete and Accurate*
### *Information to Participants and Beneficiaries*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)*

95.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

96.     As alleged above, during the Class Period, all Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

97.     As alleged above, the scope of the fiduciary responsibilities of all Defendants, to differing extents, included disseminating Plan documents and/or Plan-related information to participants regarding the Plan and/or assets of the Plan.

98.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.

99.     This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the prudence of maintaining investment in the Plan, so that participants can make informed decisions with regard to their investment options available under the Plan, especially where, as here, the Plan offers only one real investment alternative, the Company stock.

100.     This fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including potentially illegal conduct,

bearing on their retirement savings, but also to forestall such misconduct in the first instance.  By failing to discharge their disclosure duties, Defendants facilitated the misconduct in the first instance.

101.    Furthermore, Defendants breached their fiduciary duties by failing to provide the Plan participants with complete and accurate information regarding the Company's unduly high level of exposure to sub-prime mortgages and leveraged financing operations, and the consequent artificial inflation of the value of Merrill Lynch stock, and, generally, by conveying inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in the Company stock. These failures are particularly painful to participants in an Employee Stock Ownership Plan ("ESOP") retirement plan where, by definition, Plan assets are very heavily (at times, as here, exclusively) invested in a single equity during the Class Period and thus, significant depreciation in the value of this asset (here, Merrill Lynch stock) has an enormous impact on the value of participants' retirement assets.

102.    Had the Defendants not constantly reinforced the safety, stability and prudence of investment in Merrill Lynch stock during the Class Period, Plan participants, to the extent they were permitted, could have divested their holdings of Company stock in the Plan or at least diversified such holdings, thereby mitigating the Plan's losses to that extent.

103.    Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Merrill Lynch stock, despite knowing of their breaches.  Further, they enabled such conduct as a result of their own failure to satisfy their fiduciary duties and as a result of having knowledge of the other fiduciaries' failures to satisfy

their duty to provide only complete and accurate information to Plan participants, yet not making any effort to remedy the breaches.

104.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Merrill Lynch stock in the ESOP, and were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in Merrill Lynch stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants named in this Count.

105.    Plaintiff further contends that the Plan suffered a loss, and Plaintiff and  the other Class members suffered losses, by the above-described conduct of Defendants named in this Count during the Class Period because that conduct fundamentally deceived Plaintiff and the other Class members about the prudence of making and maintaining retirement investments in Merrill Lynch stock, and that, in making and maintaining investments in Merrill Lynch stock, Plaintiff and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of Defendants named in this Count.

106.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the

Plan, and indirectly Plaintiff and the other Plan participants, lost a significant portion of their retirement savings.

107.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### *Failure to Monitor Fiduciaries*

### *(Breaches of Fiduciary Duties in Violation of ERISA § 404 by Merrill Lynch and the Director Defendants)*

108.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

109.    This Count alleges fiduciary breach against the following Defendants: Merrill Lynch and the Director Defendants (the "Monitoring Defendants").

110.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

111.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other Plan fiduciaries, including the Compensation, Administrative and Investment Committee Defendants (the "Plan Committee Defendants").

112.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and

holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

113.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

114.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

115.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:  (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Merrill Lynch stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their ESOP retirement accounts.  The Monitoring Defendants undoubtedly knew that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan to continue offering the Merrill

Lynch stock as the ONLY Plan investment yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

116.    In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of Merrill Lynch that they indisputably knew or should have known that these Defendant-fiduciaries needed to make sufficiently informed fiduciary Plan asset investment decisions. This is especially true due to the Company's myriad of inappropriate investment practices, which most, if not all, Monitoring Defendants had direct knowledge of, if not complicity in. By remaining silent and continuing to conceal such information from the other fiduciaries, the Monitoring Defendants breached their fiduciary duties under the Plan and ERISA.

117.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored defendants, they enabled the breaches by these defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

118.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

119.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

### *Breach of Duty to Avoid Conflicts of Interest*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)*

120.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

121.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

122.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

123.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by continuing to allow Company stock as the ONLY Plan investment during the Class Period, by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in Merrill Lynch stock and the information provided to participants and beneficiaries concerning it, and generally failing to take whatever steps were necessary to ensure that the Plan fiduciaries did not suffer from a conflict of interest, including notifying the DOL about the information which made employer stock an unsuitable investment for the Plan.

124.    Upon information and belief, Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Merrill Lynch stock; failing to notify appropriate federal agencies, including the DOL, of the facts and transactions

which made Merrill Lynch stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate investment practices; and by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plan's investment in Merrill Lynch stock.

125.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

126.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by Merrill Lynch and the Director Defendants)

127.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

128.    This Count alleges co-fiduciary liability against the following Defendants: Merrill Lynch and the Director Defendants (the "Co-Fiduciary Defendants").

129.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

130.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

131.    Knowledge of a Breach and Failure to Remedy: ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach. Merrill Lynch and the Director Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's true level of exposure to losses stemming from the sub-prime mortgages and leveraged financing deals to the other fiduciaries.

132.    Merrill Lynch, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Merrill Lynch as a matter of law.

133.    The Director Defendants, by virtue of their positions at Merrill Lynch, participated in and/or knew about the Company's highly risky and inappropriate business practices, and their consequences, including the artificial inflation of the value of Merrill Lynch stock.

134.    Because Merrill Lynch and the Director Defendants knew of the Company's improper business practices, they also knew that the Plan Committee Defendants were breaching

their duties by (i) continuing to invest the Plan exclusively in company stock; and (ii) providing incomplete and inaccurate information to Plan participants. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Merrill Lynch's exposure to the sub-prime mortgage market and leveraged financing, and obfuscating the risk that the Company's investment practices posed to Merrill Lynch, and, thus, to the Plan.

135.    **Knowing Participation in a Breach:** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Merrill Lynch knowingly participated in the fiduciary breaches of the Plan Committee Defendants in that it benefited from the sale or contribution of its stock at artificially inflated prices. Merrill Lynch also, as a *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other defendants. Likewise, the Director Defendants knowingly participated in the breaches of the Plan Committee Defendants because, as alleged above, they had actual knowledge of the Company's improper and possibly illegal conduct and yet, ignoring their oversight responsibilities (as Directors), permitted the Plan Committee Defendants to breach their duties.

136.    Enabling a Breach. ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

137.    Merrill Lynch's and the Director Defendants' failure to monitor the Plan Committee Defendants enabled those committees to breach their duties.

138.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement savings.

139.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

140.    The Plan suffered millions of dollars in losses because substantially all of the assets of the Plan were imprudently invested or allowed to be invested by Defendants in Merrill Lynch stock during the Class Period, in breach of Defendants' fiduciary duties. This loss was reflected in the diminished account balances of the Plan's participants.

141.    Defendants are liable for the Plan's losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants withheld material, non-public facts from participants, and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of Merrill Lynch, and its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Merrill Lynch stock, and Defendants remain liable under ERISA for losses caused by such investment.

142.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Merrill Lynch stock, eliminating Merrill Lynch stock as the primary investment alternative when it became

imprudent, and divesting the Plan of its holdings of Merrill Lynch stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Merrill Lynch stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

143.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the assets of the Plan should not have been exclusively invested in Merrill Lynch equity during the Class Period.

144.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

145.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

146.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available (as they were here, in the alternative investments offered to Plan participant through Merrill Lynch's traditional 401(k) retirement plan), that the investments made or maintained in Merrill Lynch stock would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

147.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

148.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order that Defendants allocate the Plan's recoveries to the accounts of all participants who had their account balances invested in the common stock of Merrill Lynch maintained by the Plan in proportion to the accounts' losses attributable to the precipitous decline in the stock of Merrill Lynch equity;

H.      An order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including appropriate modifications to the Plan to ensure against further violations of ERISA.

DATED: November 28, 2007              **HARWOOD FEFFER LLP**

                                     Robert I. Harwood (RH-3286)
                                     Samuel K. Rosen (SR-3287)
                                     488 Madison Avenue, 8th Floor
                                     New York, New York 10022
                                     Telephone:  (212) 935-7400
                                     Facsimile: (212) 753-3630

                                     Counsel for Plaintiff

OF COUNSEL:

THE WEISER LAW FIRM, P.C.
Robert B. Weiser
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: (610) 225-2677